**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| BARBIE D. WOOTEN, ) | CASE NO. 1:09 CV 981 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | MAGISTRATE JUDGE VECCHIARELLI |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | **MEMORANDUM OPINION AND ORDER** |

Plaintiff Barbie D. Wooten challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying her claim for Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. §§ 1381 *et seq*. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the Court **VACATES and REMANDS the final decision of the Commissioner for proceedings consistent with this Order.**

## I. PROCEDURAL HISTORY

On August 17, 2005, Ms. Wooten applied for SSI, alleging disability beginning February 15, 2001.[1] (Tr. 58.) The Commissioner denied Ms. Wooten's application initially and upon reconsideration. (Tr. 45-46.) On July 14, 2008, Administrative Law Judge ("ALJ") Edmund Round held a hearing regarding Ms. Wooten's claim. (Tr. 472.)

On September 5, 2008, the ALJ denied Ms. Wooten's disability claim. (Tr. 15.) This decision became the final decision of the Commissioner when the Appeals Council denied further review. Ms. Wooten filed an appeal to this Court. On appeal, Ms. Wooten claims the ALJ's decision is not supported by substantial evidence.

## II. FACTUAL BACKGROUND

### A. Vocational Evidence

Ms. Wooten was 34 years old at the time of the ALJ's decision, and had completed the 11th grade. (Tr. 25, 477.) Ms. Wooten had no past relevant work experience. (Tr. 25, 506.) She claims disability due to multiple sclerosis ("MS"), scoliosis, vasovagal episodes, migraine headaches, obesity, hiatal hernia, chronic pain, and depression and anxiety. (Tr. 63.)

### B. Medical Evidence as of August 17, 2005

On January 10, 2005, rehabilitative physician Naomi Waldbaum, M.D., examined Ms. Wooten, who complained of numbness in her extremities, fatigue and headaches. (Tr. 107.) Dr. Waldbaum noted Ms. Wooten was previously diagnosed with multiple

---

[1] Ms. Wooten alleges a disability onset date of February 15, 2001. However, she did not file her application for SSI until August 17, 2005. She concedes that SSI is not payable prior to the month in which the application was filed. Plaintiff's Brief at 2, n.1. *See also* 42 C.F.R. 416.335.

sclerosis ("MS") in 1999, as well as hypertension, a hernia, and migraines. (Tr. 107.) Ms. Wooten's appendix and gallbladder had been surgically removed two weeks earlier. (Tr. 107.) Ms. Wooten lived in her mother's home and reported being able to drive. (Tr. 108.)

Dr. Waldbaum observed Ms. Wooten to be morbidly obese, but able to ambulate, get on and off the couch, and perform all maneuvers of the evaluation in a functional and nonantalgic manner. (Tr. 108.) Dr. Waldbaum noted Ms. Wooten's cervical and lumbar movements were normal, as were her gait, heel-to-toe walking, squatting, and reflexes and strength in her upper extremities. (Tr. 108.) Ms. Wooten had some over-reactive reflexes in her lower extremities, but otherwise showed normal sensation, strength, and motion. (Tr. 108.)

Dr. Waldbaum assessed Ms. Wooten as a "very functional client who does not appear to be depressed." (Tr. 109.) Dr. Waldbaum indicated Ms. Wooten should be able to perform sedentary to light work, provided she could keep her migraines under control and her eye symptoms resolve. (Tr. 109.)

On January 26, 2005, physiatrist Priti Nair, M.D., began treating Ms. Wooten. (Tr. 398.) Dr. Nair treated Ms. Wooten periodically through 2008. (Tr. 410.)

On March 30, 2005, neurologist Sagarika Nayak, M.D., examined Ms. Wooten and noted that, while she probably had MS, her neurological examination was normal. (Tr. 120.) He noted her complaints of dysthesias in her legs, coldness and numbness in her hands, severe constipation, and Lhermitte's symptom involving electrical-type sensations down the back of her legs. (Tr. 119.) On June 16, 2005, Dr. Nayak noted that recent MRIs confirmed her MS was still active, but her neurological exam, including

3

her gait examination, was nevertheless normal. (Tr. 110.)

On May 18, 2005, Dr. Nair completed a basic medical form. (Tr. 403.) Dr. Nair indicated that Ms. Wooten had MS with intermittent weakness, numbness, and constant paresthes as of all four extremities, as well as migraine headaches. (Tr. 403.) Dr. Nair indicated that Ms. Wooten had brisk reflexes and rated her motor strength as 4/5. (Tr. 403.) Dr. Nair indicated that Ms. Wooten could stand/walk for four hours a day (one hour without interruption) and sit for four hours a day (one hour without interruption). (Tr. 404.) Dr. Nair indicated that Ms. Wooten could lift up to 10 pounds a day frequently and 20 pounds a day occasionally, that she was moderately limited in her ability to push, pull and reach, and that she was markedly impaired in her ability to bend. (Tr. 404.) Dr. Nair concluded that Ms. Wooten would be unemployable for 12 months or more. (Tr. 404.)

On August 11, 2005, Ms. Wooten reported recurring headaches and stomach pain to her primary care physician, Jessica Griggs, D.O.

On September 7, 2005, Dr. Nair completed a disability form at the state agency's request. (Tr. 400.) Dr. Nair indicated Ms. Wooten's diagnoses were MS, lumbar degenerative disk disease and migraine headaches, and that she had intermittent exacerbations of numbness and weakness. (Tr. 401.) Dr. Nair noted that Ms. Wooten responded positively to her prescribed therapy, but still claimed pain. (Tr. 401.) Dr. Nair further noted that Ms. Wooten ambulated without an assistive device, but frequently fell, and due to intermittent exacerbations of leg weakness, she required assistance with bathing and transfers. (Tr. 402.) Dr. Nair indicated that Ms. Wooten was otherwise independent with her daily living activities, and did not comment on her work capacity.

4

(Tr. 402.)

On October 13, 2005, state agency physician Eli Perencevich, D.O., completed a residual functional capacity assessment.  (Tr. 138.)  Dr. Perencevich indicated that Ms. Wooten could occasionally lift 10 pounds and frequently lift less than 10 pounds; could stand/walk for at least two hours in a workday; could sit for about 6 hours in a workday; could never climb ladders, ropes and scaffolds; could occasionally climb ramps and stairs, stoop, crouch and crawl; and could frequently balance and kneel.  (Tr. 139-40.) Dr. Perencevich indicated this RFC was an adoption of an RFC finding made by a prior ALJ on March 10, 2005.  (Tr. 139, 40-44.)  Dr. Perencevich noted that Ms. Wooten's allegations were partially credible. (Tr. 143.)

On October 24, 2005, neurologist Stephen Sagar, M.D., evaluated Ms. Wooten after he became her physician as a result of a change in her insurance.  (Tr. 448.)  Ms. Wooten reported poor balance, frequent falls, muscle spasms in the back, electric feeling running down her legs, migraine headaches, poor night vision, numbness in her fingers and toes, and urinary hesitancy and constipation.  (Tr. 136.).  Dr. Sagar described Ms. Wooten as having "an essentially normal neurological examination with very brisk deep tendon reflexes and some unsteadiness of her gait."  (Tr. 449.)

On January 30, 2006, state agency physician Walter Holbrook, M.D., completed a residual functional capacity assessment.  (Tr. 191.)  Dr. Holbrook indicated Ms. Wooten could occasionally lift 10 pounds and frequently lift less than 10 pounds; could stand/walk for at least two hours in a workday; could sit for about 6 hours in a workday; and had limitations in pulling and pushing in her upper and lower extremities, although she could push and pull within the 10 pound weight limitation.  (Tr. 192.)  Dr. Holbrook

5

found no postural limitations. (Tr. 193.) Dr. Holbrook also indicated that this RFC was an adoption of the March 10, 2005 RFC finding. (Tr. 193.) Dr. Holbrook noted that Ms. Wooten was partially credible, and that the results of Ms. Wooten's May 5, 2005 medical examination were inconsistent with the medical evidence in the record and the March 10, 2005 ALJ findings. (Tr. 196-97.)

On February 20, 2006, Ms. Wooten appeared at the emergency room feeling hot and flushed. (Tr. 355.) Ms. Wooten was released and told to follow up with her doctor. (Tr. 355-57.)

On March 27, 2006, Dr. Sagar indicated that Ms. Wooten had "no clear attacks of MS," but she reported heat intolerance and, about once per year, episodes of total body flushing and apparent hypotension. (Tr. 447.) These episodes resulted in several trips to the emergency room, but no etiology was determined. (Tr. 447.) Dr. Sagar indicated Ms. Wooten's MS was stable, and she was tolerating her medication, Rebif. (Tr. 447.).

On June 16, 2006, Ms. Wooten was unresponsive and was brought to the emergency room. (Tr. 351.) Ms. Wooten was observed to have extremely low blood sugar and reported past similar episodes, particularly when she went to the bathroom. (Tr. 351.) Ms. Wooten was discharged on her home medications in stable condition and told to follow up with her doctor. (Tr. 352.) The diagnoses included respiratory failure – resolved, vasovagal syncope secondary to vasovagal response, MS, and depression. (Tr. 351.)

On August 21, 2006, Dr. Sagar again noted that Ms. Wooten had no clear attacks of MS, although she had required hospitalization for a "vasovagal episode" (an episode marked by slow pulse or falling blood pressure). (Tr. 417.) Dr. Sagar

6

described Ms. Wooten's MS as stable and prescribed a new medication, Avonex  (Tr. 417.)

On January 1, 2007, Dr. Nair indicated that Ms. Wooten had no changes in her symptoms or side effects from her medications, and that her muscles, joints, spine and neurologic system were at baseline.  (Tr. 396.)  Dr. Nair recommended maintaining Ms. Wooten's prescriptions, with a follow-up visit in a month.  (Tr. 396.)  On February 8, 2007, Dr. Nair administered a thoracic epidural block, which provided improvement.  (Tr. 392, 395.)  On March 3, 2007, Ms. Wooten showed no changes in her systems, which continued to be at baseline. (Tr. 392.)  Dr. Nair periodically administered additional injections.  (Tr. 371, 374, 379, 382, 384, 387, 390, 301).  On April 5, 2007, Dr. Nair reported that Ms. Wooten's systems continued to be at baseline.  (Tr. 388.)

On February 19, 2007, Dr. Sagar noted that Ms. Wooten had not had any vasovagal attacks since her last visit. (Tr. 415.)  Dr. Sagar noted that Ms. Wooten also reported weakness in her legs, constipation, urinary frequency, migraine headaches, dysthesias in the soles of her feet, and electric like sensations in her extremities.  (Tr. 415.)  Dr. Sagar indicated that it was difficult to discern which symptoms were attributable to her MS and which were psychogenic in nature.  (Tr. 415.)

On May 3, 2007, Dr. Nair noted that Ms. Wooten's headaches had been completely resolved by an occipital nerve block, that her systems continued to be at baseline, and that she was  scheduled for hernia and gastric bypass surgery.  (Tr. 386.)  Dr. Nair noted similar observations on June 4, 2007, July 2, 2007, August 1, 2007 and August 29, 2007.  (Tr. 380, 381, 383, 385.)

On September 6, 2007, Ms. Wooten underwent hernia surgery and, at the same

7

time, had a gastric bypass procedure. (Tr. 238-39.) The surgery was successful, and within two months Ms. Wooten had lost 34 pounds. (Tr. 234.)

On October 1, 2007, Dr. Nair reported Ms. Wooten was "doing well" after her surgery. (Tr. 378.) Ms. Wooten was losing weight rapidly, although she had no significant reduction in back pain yet. (Tr. 378.) Dr. Nair believed she would be able to reduce Ms. Wooten's pain medications as further weight loss reduced her pain. (Tr. 378.) Dr. Nair observed that Ms. Wooten's systems remained unchanged at baseline. (Tr. 378.) On November 28, 2007, Ms. Wooten reported increased back pain, but her symptoms still remained unchanged at baseline. (Tr. 372.)

On November 7, 2007, Ms. Wooten went to the emergency room and reported shaking, vomiting, and passing out. (Tr. 331.) Medical staff diagnosed a vasovagal attack. (Tr. 332.)

On December 10, 2007, Ms. Wooten complained of vasovagal symptoms. (Tr. 233.) However, Peter Marshall, M.D., her surgeon, suspected "dumping" – a reaction to inappropriate eating marked by rapid heartbeat, a cold sweat, anxiety and diarrhea. (Tr. 233.)

On December 20, 2007, Dr. Nair noted that Ms. Wooten had lost 50 pounds. (Tr. 370.) Ms. Wooten reported a leg length discrepancy since childhood, with secondary scoliosis. (Tr. 370.) Dr. Nair continued to treat Ms. Wooten's pain with injections and provided a heel lift for Ms. Wooten's left shoe, which Dr. Nair indicated should slowly reduce her pain. (Tr. 370.)

On January 15, 2008, Ms. Wooten returned to the emergency room reporting straining in the restroom and passing out. (Tr. 328.) Ms. Wooten reported having

8

similar attacks on a twice weekly basis. (Tr. 328.) Staff diagnosed a vasovagal episode and released her. (Tr. 329.)

On January 24, 2008, Dr. Nair wrote a "to whom it may concern letter" indicating that Ms. Wooten had "medical conditions that render her disabled from work activities at this time." (Tr. 410.) Dr. Nair indicated that Ms. Wooten was unable to stand more than one hour at a time and could only sit for three hours at a time. (Tr. 410.)

On January 17, 2008, Dr. Griggs noted that Ms. Wooten had a recent vasovagal episode and that she was experiencing them frequently. (Tr. 455.)

On February 12, 2008, neurologist Edward Westbrook, M.D., examined Ms. Wooten, who complained of her MS as well as episodes of loss of consciousness. (Tr. 412.) The results of Ms. Wooten's neurological exam were largely normal, except for some bilateral optic atrophy. (Tr.413-14.) Ms. Wooten had normal motor strength in her upper extremities, but bilateral weakness, with normal tone, in her lower extremities. (Tr. 414.) Ms. Wooten had normal coordination in her upper extremities, but "awkward and slow" coordination in her lower extremities. (Tr. 414.)

Ms. Wooten could not tandem walk, but her gait was "effective and fairly stable." (Tr. 414.) Dr. Westbrook diagnosed Ms. Wooten's MS as "mild" and was more concerned with determining the cause of her vasovagal episodes. (Tr. 414.)

On February 20, 2008, Dr. Nair completed a residual functional capacity questionnaire, indicating Ms. Wooten had MS, lumbrosacral degenerative disk disease, and vasovagal episodes. (Tr. 365.) Dr. Nair indicated Ms. Wooten was not a malingerer, and that her pain and other symptoms would interfere with her attention and concentration. (Tr. 366.) Dr. Nair stated Ms. Wooten was incapable of even low stress

9

jobs because stress resulted in syncopal episodes.  (Tr. 366.)  Dr. Nair indicated that Ms. Wooten could sit for about four hours a day (for two hours continuously) and stand/walk for two hours a day (for one hour continuously), but would need to alternate between sitting and standing, and would require unscheduled breaks during the day.  (Tr. 367.)  Dr. Nair stated Ms. Wooten could lift up to 10 pounds occasionally, but could not stoop or crouch.  (Tr. 368.)   Dr. Nair further indicated Ms. Wooten would likely miss work more than four days per month.  (Tr. 369.)

On March 21, 2008, Dr. Westbrook reviewed a recent MRI, which was consistent with MS, but showed "no signs of recent activity to suggest recent attacks."  (Tr. 452.)  Dr. Westbrook noted Ms. Wooten's blood pressure testing was stable and suggested that her episodes might be panic attacks.  (Tr. 452.)  Dr. Westbrook prescribed a tranquilizer and referred her to a specialist to rule out carcinoid syndrome (tumors of the small intestine, colon, and appendix).  (Tr. 452.)

On June 4, 2008, gastroenterologist Jason Vollweiler, M.D., examined Ms. Wooten, who reported having periodic attacks for nearly 10 years.  (Tr. 458.)  Dr. Vollweiler noted Ms. Wooten had lost 100 pounds since her gastric bypass surgery.  (Tr. 458.)  Dr. Vollweiler doubted that Ms. Wooten had carcinoid syndrome, although he recommended further testing, and suggested her problems originated with chronic constipation.  (Tr. 459.)

### C. The Administrative Hearing

On July 14, 2008, Ms. Wooten appeared with counsel at an administrative hearing.  (Tr. 472.)  Ms. Wooten testified she weighed 190 pounds at that time, but used to weigh 297 pounds.  (Tr. 478.)  Ms. Wooten testified that the only negative

10

consequence of her gastric bypass surgery was an increase in vasovagal attacks.  (Tr. 479.)  Ms. Wooten stated that, during those attacks, her blood pressure fluctuated, her body turned beet red, and she passed out.  (Tr. 479.)  Ms. Wooten said she averaged three of these attacks per month.  (Tr. 479.)  Ms. Wooten stated these attacks ranged from one-half hour to 45 minutes and sometimes caused her to fall.  (Tr. 479-80.)  Ms. Wooten said these attacks started in 1999, although no doctor was able to discern their cause.  (Tr. 480-81.)  Ms. Wooten stated her MS was diagnosed in 1998, and her symptoms were more serious when she was out of remission. (Tr. 481-82.)   Ms. Wooten testified her MS caused loss of balance, muscle spasms, and migraine headaches, although her medication limited her headaches.  (Tr. 482, 486.)  Ms. Wooten stated hot weather was difficult for her, and she napped daily for between two and four hours. (Tr. 483-84.)  Ms. Wooten also stated she had scoliosis and different length legs, which caused pain in her back and legs, although she took pain medication.  (Tr. 487-88.)  Ms. Wooten admitted she had previously been addicted to cocaine, but stated that she had been clean for four years.  (Tr. 494.)

Ms. Wooten stated her impairments limited her ability to do housework and exercise, and impaired her walking and sitting, although she drove regularly. (Tr. 489, 495.)  Ms. Wooten was able to do her own laundry, make her own meals and do the grocery shopping.  (Tr. 497-98.)  Ms. Wooten also cared for her two small dogs.  (Tr. 503.)

Vocational expert Thomas Nimberger also testified and recognized that Ms. Wooten had no past relevant work experience.  (Tr. 505-06.)  The ALJ asked a hypothetical question about an individual with Ms. Wooten's age, education, and work

11

experience, who could perform a range of sedentary work.  (Tr. 506.)  Specifically, this individual could stand/walk for two hours; sit for six hours; lift, carry, push or pull a maximum of 10 pounds; never use ladders, ropes and scaffolds; occasionally use stairs and ramps; avoid all exposure to hazards such as unprotected heights or moving machinery; and avoid driving or even moderate exposure to temperatures in excess of 85 degrees.  (Tr. 507.)  In addition, this individual would be limited to simple, routine, low stress tasks with no arbitration, negotiation, confrontation, directing the work of others or being responsible for others' safety.  (Tr. 507.)

The vocational expert testified there were sedentary, unskilled jobs that such an individual could perform, including jobs as a paper order clerk, small products bench assembler or front desk receptionist.  (Tr. 507-08.)  The vocational expert stated there were also other available jobs, in addition to the ones he identified, that Ms. Wooten could perform.  (Tr. 509.)

### III.  STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not

currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ determined that Ms. Wooten is not disabled.  Specifically, the ALJ found that Ms. Wooten has the severe impairments of multiple sclerosis ("MS"), scoliosis, vasovagal episodes, and an adjustment disorder.  However, Ms. Wooten does not have an impairment or combination of impairments that meets or medically equals on the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

The ALJ ruled that Ms. Wooten retains the residual functional capacity ("RFC") to perform sedentary work with restrictions.  Specifically, she can lift, carry push, and pull a maximum or 10 pounds, can sit for 6 hours and can stand and/or walk for 2 hours of an

8-hour day with normal breaks. She can never use ladders, ropes, or scaffolds, but can occasionally use ramps and stairs.  She cannot work in an environment with exposure to temperatures about 85 degrees Fahrenheit.  She cannot work in proximity to workplace hazards and is precluded from occupational driving.  Ms. Wooten is limited to simple, routine, low-stress tasks and is precluded from tasks the involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.

The ALJ found that considering her age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Ms. Wooten can perform.

## V.  STANDARD OF REVIEW

This Court's review is limited to determining whether substantial evidence exists in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  ANALYSIS

Ms. Wooten asserts that the decision of the ALJ is not supported by substantial evidence because he failed to assign appropriate weight to the report of the treating physician, Dr. Nair.

Regardless of its source, an ALJ is required to evaluate every medical opinion received into the record. 20 C.F.R. § 404.1527(d) and § 416.927(d).  When deciding the weight to give any physician's opinion, the following factors are considered: (1) whether the physician actually examined the patient; (2) whether a treatment relationship existed between the physician and patient; (3) whether the opinion is supported by, and is consistent with other medical evidence in the record; (4) whether the physician making the opinion is a specialist.  *Id.*

Generally, "the opinions of treating physicians are entitled to controlling weight." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (internal citation omitted).  However, the "opinion of a treating physician is entitled to greater weight only if it is based on objective medical findings and is not contradicted by substantial evidence to the contrary.  The Commissioner may reject the opinion of a treating physician where good reasons are found to do so in the record." *Hare v. Comm'r of Soc. Sec.*, 37 Fed. Appx. 773, 776 (6th Cir. 2002).  Good reasons to discount a treating physician's opinion can be: (1) it is not supported by medically acceptable clinical and laboratory diagnostic techniques, (2) it is inconsistent with substantial evidence in the record, (3) it does not identify the evidence supporting its finding, and (4) it fares poorly when applying the factors listed in 20 C.F.R. § 416.927(d)(2).  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546 (6th Cir. 2004).

In the instant action, Ms. Wooten asserts that the ALJ did not assign proper weight to treating physician, Dr. Nair.  Dr. Nair opined that: Ms. Wooten's pain and other symptoms would often interfere with attention and concentration; her syncopal episodes are related to stress and she incapable of even low stress jobs; she could sit for four hours of an eight-hour day and for no more than two hours at a time; she could stand and/or walk for four hours of an eight hour day for no more than one hour at a time; she must be able to alternate between sitting, standing, and walking during the workday; she would require unscheduled breaks during the workday; and she would likely miss more than four days of work per month.  Dr. Nair also stated that Ms. Wooten's MS had progressed and that Ms. Wooten was "disabled" and "unable to work."

The ALJ does not provide specific reasons for rejecting the functional limitations set forth by Dr. Nair.  Instead, the ALJ broadly states that he assigned Dr. Nair's opinions less weight because they were inconsistent with the evidence as a whole and with Dr. Nair's own records.  The ALJ fails to cite any evidence in the record that demonstrates that Dr. Nair's opinion is inconsistent with other medical evidence and, thus, fails to provide "good reasons."  *See Wilson*, 378 F.3d at 544 (citing Soc. Sec. Rule 96-2p) (the ALJ must provide "specific reasons for the weight given to a treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.")

The Commissioner argues that, "[a]s the ALJ noted, Dr. Nair's opinions were largely inconsistent with her ongoing treatment notes" and that Dr. Nair treated Ms.

16

Wooten conservatively; Dr. Nair expected that Ms. Wooten's pain would improve; and Dr. Nair's "more extreme" restrictions, such as Ms. Wooten's absences from work and her ability to sit or lift, were not reflected in Dr. Nair's notes.  (Doc. 17 at 14-15.)  However, this is not an accurate reflection of the ALJ's decision.  Rather, the ALJ merely found, "Dr. Nair stated that Ms. Wooten's MS has progressed, but her treatment notes repeatedly state that there are no new changes and that Ms. Wooten's neurological and musculoskeletal functioning are at baseline."  (Tr. at 23.)   In determining the weight assigned to Dr. Nair's opinion, the ALJ makes no mention of Dr. Nair's conservative treatment, her expectation of improvement, or the lack of evidence supporting the "more extreme" restrictions.  The Commissioner's *post hoc* arguments in support of the ALJ's decision are immaterial.  The Sixth Circuit has expressly held that where the ALJ fails to give good reasons for his rejection of a treating source's opinion, remand is required even if substantial evidence in the record otherwise supports the ALJ's decision. *Wilson*, 378 F.3d at 544.

Although the ALJ does cite the fact that Dr. Nair stated that Ms. Wooten's MS has progressed while Dr. Nair's treatment notes indicate that Ms. Wooten's condition did not change and that her neurological and musculoskeletal functioning are at baseline, this fact alone does not provide reason to reject the functional limitations set forth by Dr. Nair, nor does it purport to do so.  Ms. Wooten argues that the ALJ took Dr. Nair's indication that Ms. Wooten was functioning at baseline "to mean that she was not in pain or experiencing any other symptoms attributable to her multiple medical disorders."  (Doc. 14 at 15.)  In response, the Commissioner argues that this was not the ALJ's interpretation of the term "baseline," but rather that the ALJ recognized that

17

Ms. Wooten's condition was documented as "normal" and "unchanged." (Doc. 17 at 15-16.) Quite frankly, it is unclear what the ALJ determined "baseline" to mean as the decision provides no definition or other insight into the term.

Moreover, there is no indication in the record that the functional limitations set forth by Dr. Nair are based on her finding that Ms. Wooten's MS had worsened, nor does the ALJ clearly make that argument. In a previous report from 2005, Dr. Nair opined that Ms. Wooten required many of the same functional limitations set forth in her report from 2008. The fact that Ms. Wooten's MS did not get worse would seem to have no impact on these limitations. Furthermore, the ALJ recognized that Ms. Wooten's condition had, in fact, worsened by finding the evidence submitted after the reports of the reviewing physicians, Drs. Waldaum, Perencevich, and Holbrook, who evaluated Ms. Wooten in 2005 and early 2006, demonstrated greater limitations than they had set forth. (Tr. at 24.) Thus, the single internal inconsistency cited by the ALJ is not good reason for rejecting Dr. Nair's opinion regarding Ms. Wooten's functional limitations.

Additionally, as the Commissioner asserts, the ALJ's statement that a finding that an individual is "disabled" or "unable to work," is an administrative finding reserved to the Commissioner is correct. 20 C.F.R. § 404.1527(e); *see Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Stiltner v. Comm'r of Soc. Sec.*, 244 Fed.Appx. 685, 689 (6th Cir. 2007) ("As an initial matter, we note that the determination of disability is ultimately the prerogative of the Commissioner, not the treating physician."). However, this statement only provides good reason for rejecting Dr. Nair's findings that Ms. Wooten is disabled or unable to work and does not provide a reason for rejecting Dr. Nair's specific functional limitations.

18

While good reason may exist to assign minimal weight to Dr. Nair's opinion regarding Ms. Wooten's functional limitations, the ALJ failed to properly set forth such reasons.  Thus, the ALJ's failure to assign full weight to Dr. Nair's opinion regarding Ms. Wooten's functional limitations is not supported by substantial evidence.[2]

## VII.  DECISION

For the foregoing reasons, the Court finds the decision of the Commissioner is VACATED and REMANDED.

**IT IS SO ORDERED.**

                                                  s/ *Nancy A. Vecchiarelli*
                                                  U.S. Magistrate Judge

Date:  January 14, 2010

---

[2] Ms. Wooten raises additional arguments with regard to the ALJ's decision.  Specifically, she asserts that the ALJ's determination regarding the RFC finding and her credibility are not supported by substantial evidence.  As both determinations are impacted by the weight assigned to Dr. Nair's opinions, the Court declines to review these issues at this time.